IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System of :
Higher Education, :
                Petitioner :
  :
      v. :
  :
Pennsylvania Labor Relations :
Board, : No. 209 C.D. 2025
         Respondent : Argued: December 10, 2025

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE MATTHEW S. WOLF, Judge

OPINION[1]
BY JUDGE FIZZANO CANNON               FILED: May 13, 2026

      The Pennsylvania State System of Higher Education (PASSHE)
petitions for review of the January 21, 2025 final order (Final Order) of the
Pennsylvania Labor Relations Board (PLRB), which dismissed PASSHE's

---

[1] After circulation and consideration by the full Court, this case proceeded to judicial conference in accordance with the Commonwealth Court's Internal Operating Procedures and is being filed as a plurality opinion. 210 Pa. Code § 69.256.

> If, pursuant to vote after judicial conference consideration, a majority of all of the Judges, as well as a majority of the Judges who heard the case or to whom it was submitted on briefs, favor the result reached in the circulated draft opinion, that opinion, together with any concurring or dissenting opinions and notations of concurrences or dissents, shall be filed.

*Id.*

exceptions to a Hearing Examiner's second proposed decision and order (Second PDO). The Second PDO concluded that California University of Pennsylvania (University)[2] engaged in unfair labor practices in violation of Section 1201(a)(1) of the Public Employe Relations Act (PERA)[3] when it directed Intervenor, Association of Pennsylvania State College and University Faculties (Union), to remove a poster identifying "strikebreakers" in a public university hallway and subsequently investigated the local Union president. For the following reasons, we affirm in part and reverse in part.

## I. Background

On October 12, 2016, local Union president, Barbara Hess, sent email correspondence advising all faculty members of the University not to cross the picket line in an upcoming strike. Reproduced Record (R.R.) at 341a-42a. In relevant part, the email stated "[t]he other reason to not cross the picket line is that there is the chance that your department may not approve that you be hired back again. Keep in mind that the persons who voted to hire you also have the power to say 'We don't want you back.'" *Id*. A few days later, the Union commenced a Commonwealth-wide strike from October 19 through October 21. *Id.* at 9a. Despite the scope of the strike, some members of the local chapter of the Union at the University did not participate and broke the picket line to carry on with their daily responsibilities. Pertinently, Michele Pagen, a professor of music and theater at the University, crossed the picket line to meet with the provost regarding concerns Pagen had about

_____

[2] California University of Pennsylvania is 1 of the 14 public universities represented by PASSHE.

[3] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

2

the theater program. *Id.* Similarly, Marcia Hoover, a professor in the University's Department of Secondary Education and Administrative Leadership, crossed the picket line to teach two classes during the strike. *Id.* at 10a.

On December 8, 2016, the Union hung a poster on the bulletin board outside its University office that listed all of the faculty members who did not participate in the strike. R.R. at 9a. This poster was also displayed inside the local Union chapter office. *Id.* The poster was titled "**Strikebreakers 2016:** The Infamous 43" and contained two columns that categorized non-participating faculty as either "Tenure/Tenure Track" or "Adjunct Faculty." *Id.* That same day, Hess sent the following email informing Union members that the "strikebreakers list" had been posted:

> The strike pulled us all together and we stood together as a body to prove a point . . . . For your information, a list of those who decided not [to] be [] in solidarity with us but decided to cross the picket line has been posted in the [Union] Chapter President's office . . . and on the [Union] bulletin board[.]

*Id.* at 343a. These communications were made six weeks after the end of the strike. *Id.* at 108a.

After the strikebreakers list was publicized, Professors Pagen and Hoover—both named on the list—contacted several members of University Administration and Human Resources. R.R. at 9a-11a. In pertinent part, both emails communicated concerns with the allegedly threatening nature of the posting[4] and

---

[4] Professor Pagen wrote, in relevant part:

> I think, by now, you are all well aware of the actions taken by . . . [the Union] President. Allow me to voice my concern that this

3

potential career backlash.[5] *See id.* at 359a & 361a. Pagen specifically noted several instances of cyberbullying that had occurred since she crossed the picket line. *Id.* at 359a. On December 9, 2016, the provost, University Labor Relations representatives, and University counsel convened to discuss the concerns raised by Pagen and Hoover regarding the strikebreakers list. *Id.* at 11a. The University thereafter determined that an investigation of the circumstances surrounding the strikebreakers list was necessary due to the concerns of retaliation raised by two faculty members. *Id.* The University also sent an email to Hess, instructing her to remove the strikebreakers list from the hallway bulletin board by the close of business on December 9, 2016. *Id*. at 4a. However, the list was not removed until the following Monday due to complications involving locating the key to the glass case enclosing the bulletin board. *Id.* at 12a.

On December 12, 2016, the director of University Human Resources notified Hess pursuant to Article 43 of the 2011-2015 collective bargaining agreement (CBA) that an investigation was being conducted into the allegedly

---

action was taken for the sole purpose [of] ensuring that "The Infamous 45 [sic]" . . . are subjected to further intimidation and attempted public shaming.

I would like to think that the faculty across campus would not commit acts of violence or physical retribution in some manner, but I no longer believe that to be so.

It is my hope that the administration will make public their [sic] support and protection of those who are named on the list.

R.R. at 359a.

[5] Professor Hoover wrote, in relevant part: "I feel personally threatened and intimidated by this on a variety of levels. First the sign is directly outside my office making me an easy target. Secondly, I have applied for promotion and the President's Merit Award in Teaching both of which require a peer review process." R.R. at 361a.

threatening nature of the strikebreakers list. R.R. at 6a. Hess was further informed that an investigatory interview would be held in order to allow her to respond to the allegations against her and the Union. *Id.* Human Resources thereafter sent the following email to every faculty member listed on the strikebreakers list:

> Your name was included on a list that was posted on the [Union] bulletin board in Keystone Hall. This list included the names of faculty that crossed the picket line during the strike and chose to work, as determined by [the Union]. The list was entitled "Strikebreakers 2016: The Infamous 43." The University directed [the Union] to take this list down, which they [sic] have as of December 12th. Please contact me . . . if you wish to share any information related to this posting. Please feel free to contact me . . . if you wish to do so.

R.R. at 7a.

Section 1201(a)(1) of PERA prohibits "[p]ublic employers, their agents or representatives [from] [i]nterfering, restraining or coercing employes in the exercise of the rights guaranteed by Article IV of this act." 43 P.S. § 1101.1201(a)(1). Similarly, Section (a)(3) prohibits the same actors from "[d]iscriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization." *Id.* § 1201(a)(3). On December 21, 2016, the Union filed a Charge of Unfair Practices (Charge) against PASSHE with the PLRB and alleged that the University violated Section 1201(a)(1) and (3) of PERA, 43 P.S. § 1101.1201(a)(1) & (3), when the University directed the Union to remove the strikebreakers poster from the hallway bulletin board. R.R. at 37a. However, the PLRB declined to issue a complaint and dismissed the Charge. *Id.* Thereafter, the Union filed exceptions to the PLRB's denial but withdrew its argument under Section 1201(a)(3). *Id.* at 8a.

5

The PLRB sustained the exceptions and issued a complaint on the Section 1201(a)(1) Charge on March 8, 2017, as well as a notice of hearing scheduled for June 26, 2017. *Id.*

On February 28, 2017, the University held the investigatory interview to discuss the aforementioned allegations, as well as new allegations about the falsity and unprofessional nature of the list. *Id.* at 13a-14a. The investigation closed on March 24, 2017, and the University determined that no further action or disciplinary proceedings were necessary. *Id.* at 14a.

On June 26, 2017, the first hearing was held before a PLRB Hearing Examiner, who thereafter issued the first proposed decision and order (First PDO) on November 22, 2017. R.R. at 8a & 16a. The First PDO dismissed the Charge and determined that the poster's use of "infamous" to describe the strikebreakers brought the conduct outside the protection of lawful union communication under Section 401 of PERA, 43 P.S. § 1101.401. *Id.* at 15a. The Union filed timely exceptions to the First PDO, and the PLRB ordered a remand to the Hearing Examiner for further proceedings. *Id.* at 17a. In its remand order, the PLRB first concluded that the poster's use of "infamous" was not enough to bring the conduct outside the protection of Section 1201(a)(1). *Id.* at 22a. The PLRB also noted that the Hearing Examiner failed to specifically determine whether the University's poster removal directive and subsequent investigation violated Section 1201(a)(1) of PERA, 43 P.S. § 1101.1201(a)(1), in the First PDO. *Id.* As such, the PLRB ordered further proceedings on this issue consistent with its determination that the poster's use of "infamous" was protected. *Id.*

On July 16, 2024, the Hearing Examiner issued the Second PDO, wherein he sustained the Charge against PASSHE pursuant to Section 1201(a)(1),

6

43 P.S. § 1101.1201(a)(1). *See* R.R. at 33a-34a. PASSHE filed timely exceptions to the Second PDO, but they were denied by the PLRB's Final Order, making final the Second PDO. *Id.* at 37a & 46a. PASSHE's petition for review to this Court followed on February 19, 2025. Pet. for Review at 5.

## II. Issues

Before this Court,[6] PASSHE argues that the PLRB erred in finding that the Union was engaging in protected union activity when the Union published a poster identifying "strikebreakers" in a public university hallway. PASSHE's Br. at 22. Specifically, PASSHE maintains that the Union's "threatening" actions and communications were not protected union activity under Section 401 of PERA, 43 P.S. § 1101.401. *Id.* at 24. PASSHE also avers that, regardless of the nature of the communication, PASSHE's legitimate reasons for its removal of the poster outweighed the Union's right to communicate with its members. *Id.* at 34. As a result, PASSHE requests that this Court reverse the PLRB's Final Order and remand with a direction to dismiss the Charge. *Id.* at 48.

The PLRB maintains that it properly addressed the matter under the requisite standards set forth under Sections 401 and 1201(a)(1) of PERA, 43 P.S. §§ 1101.401 & 1101.1201(a)(1). PLRB's Br. at 2. In its intervenor brief, the Union similarly argues that the Final Order must be affirmed by this Court

---

[6] "Our review is limited to determining whether findings of fact are supported by substantial evidence, and whether the PLRB violated constitutional rights, committed a procedural irregularity, or erred as a matter of law." *Allegheny Cnty. Prison Emps. Indep. Union v. Pa. Lab. Rels. Bd.*, 339 A.3d 565, 569 n.5 (Pa. Cmwlth. 2025) (citing *Chester Upland Sch. Dist. v. Pa. Lab. Rels. Bd.*, 150 A.3d 143, 149 n.2 (Pa. Cmwlth. 2016)). "[I]t is well settled that a decision of the PLRB must be upheld if the PLRB's factual findings are supported by substantial evidence, and if conclusions of law drawn from those facts are reasonable, not capricious, arbitrary, or illegal." *Borough of Ellwood City v. Pa. Lab. Rels. Bd.*, 998 A.2d 589, 594 (Pa. 2010) (citation omitted).

because the findings were supported by substantial evidence. Union's Br. at 1. As such, both the PLRB and the Union contend that the petition for review should be denied, and the Final Order should be affirmed. *See* PLRB's Br. at 26; Union's Br. at 30-31.

### III. Discussion

### A. Protected Union Activity Under PERA

Section 401 of PERA provides that

> [i]t shall be lawful for public employes to organize, form, join or assist in employe organizations or to engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection or to bargain collectively through representatives of their own free choice and such employes shall also have the right to refrain from any or all such activities, except as may be required pursuant to a maintenance of membership provision in a collective bargaining agreement.

43 P.S. § 1101.401. Generally, the posting of information about union activity in union spaces is protected under Section 401, 43 P.S. § 1101.401. *See, e.g.*, *Pa. Soc. Servs. Union, Loc. 668, SEIU, AFL-CIO v. Cmwlth. of Pa., Dep't of Pub. Welfare*, 26 PPER ¶ 26051 (Final Order, 1995) (noting that management did not prohibit the union from distributing materials to members and posting materials on the union-specific bulletin board); *United Steelworkers of Am. v. Sw. Pa. Water Auth.*, 26 PPER ¶ 26170 (Proposed Decision and Order, 1995) (stating that a union posting about a collective bargaining agreement on a union bulletin board was a protected act).

Protected conduct will lose protection under Section 401 if it is "offensive, defamatory, or opprobrious." *PSSU, Loc. No. 668, SEIU, AFL-CIO v.*

*Wash. Cnty.*, 23 PPER ¶ 23073 (Final Order, 1992). However, mere "intemperate, inflammatory or insulting" conduct does not rise to the level of offensiveness required to strip union activity of Section 401 protections. *Id.*

While Pennsylvania has not determined the exact parameters of "offensive, defamatory, or opprobrious," this Court has stated that "[w]hen there are no Pennsylvania cases on point, we have been encouraged by the Supreme Court of Pennsylvania to follow the [National Labor Relations Board (NLRB)] cases interpreting provisions of the [National Labor Relations Act (NLRA)] similar to the PERA." *Cmwlth. v. Pa. Lab. Rels. Bd.*, 826 A.2d 932, 934 (Pa. Cmwlth. 2003); *see also San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959) ("[S]tate jurisdiction too must yield to the exclusive primary competence of the [NLRB]."). As such, NLRB cases interpreting "offensive, defamatory, or opprobrious" act as persuasive authority.[7] *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin,* 418 U.S. 264 (1974) (union's newsletter publishing "List of Scabs" and attaching "Definition of Scab" cartoon was protected activity); *Auto Workers Loc. 148 (McDonnell-Douglas)*, 296 NLRB 970 (Decision and Order, 1989) (union's publication and distribution of list of employees who crossed picket line was protected activity); *Sw. Bell Tel. Co.*, 276 NLRB 1053 (Decision and Order, 1985) (posting of "Definition of a Scab" cartoon on bulletin board was protected activity). Generally, the communication will not fall outside of Section 401, 43 P.S.

---

[7] While federal decisions are not binding precedent on this Court, we may look to decisions of the NLRB for guidance where the case involves similar labor policy concerns. *See Delaney v. City of Wilkes-Barre*, 947 A.2d 854, 861 n.9 (Pa. Cmwlth. 2008) (maintaining that it was "appropriate for the PLRB to find decisions of the [NLRB] instructive in interpreting comparable statutes of this Commonwealth"); *see also Am. Fed'n of State, Cnty. & Mun. Emps., Council 13 v. Pa. Lab. Rels. Bd.*, 529 A.2d 1188, 1190 (Pa. Cmwlth. 1987) (federal decisions may be looked to for guidance, not as binding precedent).

§ 1101.401, unless it is defamatory or libelous, and peripheral to the labor issue. *See, e.g.*, *Meyer v. Joint Council, I.B.T., C., W. & H.*, 206 A.2d 382, 387 (Pa. 1965) (holding that fighting words and "libelous utterances," particularly those that are peripheral or insignificant to the labor issues involved, are not protected communications under parallel provisions of the NLRA).

Here, the PLRB's Final Order determined that the strikebreakers poster was displayed for informational purposes. R.R. at 42a-43a. This conclusion was supplemented both by Hess's testimony stating that she did not believe adverse action should be taken against the named strikebreakers and her December 8, 2016 email sent in response to Union members' late requests for the strikebreakers' identities, which expressly stated that "a list of those who decided not [to] be [] in solidarity with us" was posted "[f]or your information." *See id.* While PASSHE argues that the use of the word "infamous" on the poster removes the communication from informational Section 401 protections, 43 P.S. § 1101.401, this argument lacks merit. PASSHE's Br. at 26.

In *Old Dominion Branch No. 496*, 418 U.S. at 277, the United States Supreme Court stressed that the hallmark of protection under the NLRA[8]—which preempts state labor laws when the conduct is subject to Sections 7 or 8 of the NLRA[9]—is the guarantee of freedom of speech through employees' rights "to form,

---

[8] 29 U.S.C. §§ 151-169.

[9] In *San Diego Building Trades Council*, 359 U.S. at 245, the United States Supreme Court stated that

> [w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [NLRA], or

10

join, or assist labor organizations." *Id*. at 277 (citing 29 U.S.C. § 157). Such freedom of speech includes a right in unions "to use all lawful propaganda to enlarge their membership." *NLRB v. Drivers Loc. 639*, 362 U.S. 274, 279 (1960). Further, "statements of fact or opinion relevant to a union organizing campaign are protected by [the NLRA], even if they are defamatory," "overenthusiastic," or contain epithets that are commonplace in union struggles. *Old Dominion Branch No. 496*, 418 U.S. at 277; *see also Linn v. United Plant Guard Workers*, 383 U.S. 53, 60-61 (1966) (stating that epithets such as "scab," "unfair," and "liar" are not so indefensible as to remove them from NLRA protection). In the same vein, the Union's use of "infamous" to describe the strikebreakers is lawfully related to union organizing campaigns; it is not peripheral or insignificant to the labor issues involved, nor does it constitute a "libelous utterance[]" against the named strikebreakers. *Meyer*, 206 A.2d at 387. An "infamous" individual is one who may be characterized as "not respectable."[10] Such rhetoric is functionally synonymous to the use of "scab" which has been used for years and is protected by our precedent. Thus, a reasonable person could interpret "infamous" as an overenthusiastic use of rhetoric to highlight the impact of Union members refusing to participate in the Union cause against the University.

> constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.

Section 7 of the NLRA protects employees' "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," whereas Section 8 prohibits unfair labor practices by the employer that "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7." *See* 29 U.S.C. §§ 157-58. If Pennsylvania established more stringent speech restrictions on unions under Section 401 of PERA, it would run directly afoul of Section 7 of the NLRA.

[10] https://www.merriam-webster.com/thesaurus/infamous (last visited May 12, 2026).

Moreover, the record contains clear evidence that the strikebreakers poster was hung because Union members were still specifically inquiring as to the identities of the strikebreakers six weeks later. R.R. at 42a. As such, the collateral inclusion of the word "infamous" does not function as a call to action for union members who were already requesting the names of the strikebreakers six weeks after the strike had ended. Therefore, we reject PASSHE's argument that the Union's use of the word "infamous" removed the strikebreakers poster from Section 401 protections under PERA, 43 P.S. § 1101.401.

## B. PASSHE's Legitimate Reasons for Intervention
### 1. Removal of the Poster

This Court has reiterated that it does not act as the factfinder and it will "not lightly substitute [its] judgment for that of the [PLRB]" because the PLRB has substantial administrative expertise in the area of public employee labor relations. *Stabler Constr., Inc. v. Cmwlth.*, 692 A.2d 1150, 1153 (Pa. Cmwlth. 1997); *Teamsters Loc. Union 77 v. Pa. Lab. Rels. Bd.*, 492 A.2d 782 (Pa. Cmwlth. 1985). Regardless, this Court must still be vigilant for violations of constitutional rights and errors of law. *Harbaugh v. Pa. Lab. Rels. Bd.*, 528 A.2d 1024, 1026 (Pa. Cmwlth. 1987). Section 1201(a)(1) of PERA prohibits "[p]ublic employers, their agents or representatives [from] . . . [i]nterfering, restraining or coercing employes in the exercise of rights guaranteed in Article IV of this act." 43 P.S. § 1101.1201(a)(1). Importantly, Section 1201(a)(1), 43 P.S. § 1101.1201(a)(1), only prohibits coercion by the *employer*; thus, the University cannot argue that the Union was coercing its

12

members to participate in future unionized activity under Section 1201(a)(1).[11] An employer commits an independent violation of Section 1201(a)(1) "where in light of the totality of the circumstances the employer's actions have a tendency to coerce a reasonable employe in the exercise of protected rights." *Fink v. Clarion Cnty.*, 32 PPER ¶ 32165 (Final Order, 2001). However, a Section 1201(a)(1), 43 P.S. § 1101.1201(a)(1), violation cannot be found where an employer presents a legitimate basis for its conduct that outweighs any coercive effect the employer's conduct may have. *Temple Univ.*, 23 PPER ¶ 23118 (Proposed Decision and Order, 1992), *aff'd on other grounds*, 25 PPER ¶ 25121 (Final Order, 1994).

In *Pennsylvania Social Services Union*, 26 PPER ¶ 26051 (Final Order, 1995), the union argued that an employer committed unfair labor practices in violation of Section 1201(a)(1) of PERA, 43 P.S. § 1101.1201(a)(1), when the employer removed and banned postings of signs protesting employee workloads. The employer argued that posting printed material was prohibited in limited areas, but such postings were permitted on the "contractually provided bulletin board provided exclusively for the [u]nion's use." *Id*. The PLRB determined that a proper balance between an employer's right to have an orderly workplace and a union's right to communicate with its members was a necessary consideration. *Id*.[12]

---

[11] Section 211.6(2)(a) pertains to unfair labor practices where a union organization "intimidate[s], restrain[s], or coerce[s] any employe for the purpose and with the intent of compelling such employe to join or refrain from joining any labor organization." 43 P.S. § 1101.211.6(2)(a). However, neither party raised arguments under this Section.

[12] While the PLRB did affirm a Charge of Unfair Practices in the cited case, it was enforced on the grounds that the employer's sudden enforcement of a tidy workplace was pretextual. *See Pa. Soc. Servs. Union*, 26 PPER ¶ 26051 (Final Order, 1995).

In contrast, the University directed only the removal of the strikebreakers poster from the bulletin board in the public hallway, and there is no evidence that the University interfered with the postings in other designated Union spaces or with communications of this information to members. Further, the agreement between the Union and the University states that

> Duly authorized representatives of [the Union] shall be permitted to transact official [Union] business on University property at reasonable times, ***provided that such business shall not interfere with or interrupt normal University operations or the responsibilities of faculty members.***

R.R. at 366a (emphasis added). The language of the agreement stresses the discretion retained by the University over University property. Thus, while the Union is entitled to use the bulletin board it purchased, such bulletin board is still located within the Keystone Building, a building owned by the University on the University campus. *Id.* at 9a. As such, the University retains discretion over interferences and interruptions within its space.

Pennsylvania's First Amendment jurisprudence is further instructive, noting that "expressive rights are 'not absolute'" and that there must be reconciliation between "the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission." *See Pa. State Sys. of Higher Educ. v. Pa. State Sys. of Higher Educ. Officers Ass'n* (Pa. Cmwlth., No. 961 C.D. 2022, filed May 1, 2024) (quoting *Cmwlth. v. Knox,* 190 A.3d 1146, 1154 (Pa. 2018));[13] *Borough of Duryea, Pa. v.*

---

[13] Under Section 414(a) of the Commonwealth Court's Internal Operating Procedures, unreported decisions of the Commonwealth Court issued after January 15, 2008, may be cited for their persuasive value. 210 Pa. Code § 69.414(a).

*Guarnieri*, 564 U.S. 379, 386 (2011). Thus, "[w]hen someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." *Borough of Duryea, Pa*., 564 U.S. at 386-87 (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)). Therefore, the University does not run afoul of PERA or the First Amendment if the Union's conduct "interfere[s] with the normal operations of the University."

By definition, the Union's strikebreakers poster interfered with the normal operations of the University because it generated fear of physical violence which thereby required disciplinary investigation. *See* R.R. at 359a. Moreover, the strikebreakers poster was posted six weeks after the strike ended; it was not communicating ongoing Union activity, and Union members were informed of several other locations where they could view the list. *See id.* at 343a. Thus, any potentially coercive circumstances do not outweigh the University's legitimate reason for directing the poster's removal from a University-controlled space upon an interference with the University's normal and effective operations. Therefore, the directive to remove the poster was not a violation of Section 1201(a)(1), 43 P.S. § 1101.1201(a)(1).

## 2. Initiation of Investigation of the Union

The argument that the University exerted coercive authority in contravention of Section 1201(a)(1), 43 P.S. § 1101.1201(a)(1), by initiating an investigation against Hess and the Union also lacks merit. The University did not engage in an unprompted investigation after discovering the poster, but rather, upon receiving faculty complaints. Pursuant to Article 43 of the CBA, the University has

a responsibility to investigate a faculty member's allegations of harassment against another faculty member. R.R. at 25a-26a. Specifically, Article 43 provides, in relevant part:

> The STATE SYSTEM and [the Union] recognize that it may be necessary to investigate complaints against FACULTY MEMBERS prior to making a disciplinary decision. When appropriate, attempts should be made to resolve complaints informally. In those cases in which complaints are not resolved informally, the principles below shall apply:
>
> A. If the University determines to conduct an investigation of a complaint, either verbal or written, it shall be initiated and concluded within a reasonable amount of time. Absent unusual circumstances, the decision to conduct a formal investigation shall be made within twenty (20) days of receipt of the complaint . . . .
>
> G. This Article shall supplement and by no means shall diminish the rights of any FACULTY MEMBER, [the Union], or the STATE SYSTEM/UNIVERSITIES under any law, *including the Pennsylvania Public Employee* [sic] *Relations Act*.

*Id.* (emphasis added).

Here, several complaints were made about Hess, and two professors explicitly expressed fear of physical and career harm due to what they believed to be the threatening nature of the poster. *Id.* at 9a-11a. Such concerns were not facially unfounded, as Professor Pagen reported that she suffered both in-person harassment and cyberbullying from current and former colleagues after crossing the picket line. *Id.* at 359a. Thus, the University acted reasonably by conducting a formal investigation; Article 43 grants discretion to do so, and the concerns of

16

physical harm compounded by testimony of actual, ongoing harassment is suggestive of a serious issue. Further, while the Article 43 investigation offers a remedy for complainants, an investigation is also a protective tool to ensure that an individual is not punished for conduct that is not objectively harmful. As in this case, despite several complaints, Hess was not disciplined for the strikebreakers poster after the investigation. *Id.* at 14a.

Based on the above discussion, we determine that the University necessarily investigated the surrounding circumstances pursuant to Article 43 of the CBA that all parties were on notice of, and an objective, formal investigation is not inherently coercive. As a result, the University's fulfillment of its duty did not violate Section 1201(a)(1), 43 P.S. § 1101.1201(a)(1).

## IV. Conclusion

Based on the foregoing discussion, this Court concludes that the Union's use of "infamous" in the strikebreakers poster was protected under Section 401 of PERA. However, the PLRB erred in its Charge against PASSHE; the University had legitimate reasons for its removal directive under the totality of the circumstances, and this directive was limited to the poster in the public hallway. Accordingly, we affirm the PLRB's determination that the strikebreakers poster was protected under Section 401 but reverse the Charge of Unfair Practice against PASSHE.

_____
CHRISTINE FIZZANO CANNON, Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System of : 
Higher Education, : 
                    Petitioner : 
 : 
        v. : 
 : 
Pennsylvania Labor Relations : 
Board, : No. 209 C.D. 2025
              Respondent : 

# O R D E R

AND NOW, this 13th day of May, 2026, the January 21, 2025 Final Order of the Pennsylvania Labor Relations Board (PLRB) is AFFIRMED in part and REVERSED in part. The PLRB's determination that the placement on a bulletin board of a poster identifying strikebreakers and labeling them as "infamous" was protected union activity is AFFIRMED. The PLRB's determination sustaining the Charge of Unfair Practice against the Pennsylvania State System of Higher Education is REVERSED.

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System of       :
Higher Education,                  :
                 Petitioner        :
                                   :
        v.                         :
                                   :
Pennsylvania Labor Relations       :
Board,                             :     No. 209 C.D. 2025
                 Respondent        :     Argued: December 10, 2025

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE MATTHEW S. WOLF, Judge


CONCURRING/DISSENTING OPINION
BY JUDGE COVEY                              FILED:  May 13, 2026


        I agree with the Majority's conclusion that the Pennsylvania Labor

Relations Board (PLRB) erred in its Charge of Unfair Practices (Charge) against the

Pennsylvania State System of Higher Education (PSSHE) because California

University (University) had legitimate reasons for its removal directive under the

totality of the circumstances, and this directive was limited to the poster in the public

hallway.  However, because I do not believe that the strikebreakers poster was

protected under Section 401 of the Public Employe Relations Act (PERA),[1] 43 P.S. §

1101.401, I respectfully dissent.

        The Association of Pennsylvania State College and University Faculties

(APSCUF) conducted a Commonwealth-wide strike from October 19 through October

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

21, 2016 (October 2016 Strike). Some members of APSCUF's local chapter (local chapter) at the University did not participate in the strike. At the University, APSCUF has a bulletin board in the hallway outside its office on the first floor of the Keystone Building. The first floor of the Keystone Building also contains faculty offices and classrooms. On December 8, 2016, the local chapter's executive committee hung a poster containing a list of members who did not participate in the October 2016 strike. On that same date, Dr. Barbara Hess, local chapter President, sent an e-mail informing the members that the *strikebreakers list* had been posted on APSCUF's bulletin board and in the local chapter's office.

The strikebreakers list contained the following heading in large font: "**_Strikebreakers 2016:_** *The Infamous 43*[.]" Reproduced Record (R.R.) at 383a (emphasis in original). Below the heading were two columns that identified the faculty who chose not to participate in the strike as either Tenure/Tenure Track or Adjunct Faculty. There were 17 names listed under the Tenure/Tenure Track column and 24 names listed under the Adjunct Faculty column. After the strikebreakers list was publicized, Dr. Michele Pagen (Dr. Pagen), a professor of music and theater at the University and an APSCUF member, and Dr. Marcia Hoover, a professor in the University's Department of Secondary Education and Administrative Leadership and an APSCUF member - both named on the list - emailed several members of University Administration and Human Resources. *See* R.R. at 9a-11a. In pertinent part, the emails communicated concerns with the allegedly threatening nature of the posting and potential career backlash. *See* R.R. at 359a, 361a. Dr. Pagen specifically noted several instances of cyberbullying that had occurred since she crossed the picket line. *See* R.R. at 359a.

PSSHE argues that the PLRB erred when it found that APSCUF engaged in protected activity when it published the strikebreakers list in a public university hallway. PSSHE contends that the strikebreakers list contained the adjunct and

tenure/tenure track status of those faculty whom APSCUF leadership believed had crossed the picket line during a strike that had ended six weeks previously, and it labeled them as *infamous*. PSSHE asserts that this was, at best, an APSCUF-sponsored public and explicit shaming or humiliation of faculty members who chose to cross the picket line; at worst, it was an invitation by APSCUF for retaliation against, and a threat to the careers of, those faculty who exercised their rights under Section 401 of PERA not to strike.

> Section 401 of PERA provides:
>
> It shall be lawful for public employes to organize, form, join or assist in employe organizations or **to engage in lawful concerted activities** for the purpose of collective bargaining or other mutual aid and protection or to bargain collectively through representatives of their own free choice and such **employes shall also have the right to refrain from any or all such activities**, except as may be required pursuant to a maintenance of membership provision in a collective bargaining agreement.

43 P.S. § 1101.401 (emphasis added). As stated by the Majority, "[p]rotected conduct will lose protection under Section 401 [of PERA] if it is '**offensive**, **defamatory**, or **opprobrious**.'[2] *PSSU, Loc. No. 668, SEIU, AFL-CIO v. Wash. Cnty.* [(*PSSU*)], 23 PPER ¶ 23073 (Final Order, 1992)." *Pa. State Sys. of Higher Educ. v. Pa. Lab. Rels. Bd.* (Pa. Cmwlth. No. 209 C.D. 2025, filed May 13, 2026) (*PSSHE*), slip op, at 8 (emphasis added). "However, mere 'intemperate, inflammatory or insulting' conduct does not rise to the level of offensiveness required to strip union activity of Section 401 [of PERA's] protections." *PSSHE*, slip op. at 8 (quoting *PSSU*, 23 PPER ¶ 23073).

Here, APSCUF hung a poster describing the strikebreakers as **infamous**. The Merriam-Webster Online Dictionary defines "infamous" as:

---

[2] Significantly, Merriam-Webster defines "**opprobrious**" as: "deserving of opprobrium **: infamous**." https://www.merriam-webster.com/dictionary/opprobrious (emphasis added) (last visited May 12, 2026).

**1 :** having a reputation of the worst kind **:** notoriously evil

an *infamous* traitor

**2 :** causing or bringing infamy **:** disgraceful

an *infamous* crime

**3 :** convicted of an offense (as a felony) bringing infamy

*Id*. (emphasis in original).[3]  Further, synonyms for infamous include, *inter alia*: "notorious, shady, criminal, immoral, disgraceful, shameful, ignominious, disreputable, shoddy, bad, discreditable, dishonorable, **opprobrious**, shy, low, dirty, louche, **vile**, and **vicious**."  *Id*. (emphasis added).[4]  By definition, describing the strikebreakers as infamous is more than merely "intemperate, inflammatory or insulting."  *PSSHE*, slip op. at 8 (quoting *PSSU*, 23 PPER ¶ 23073).  In addition, APSCUF waited until six weeks after the strike to hang the poster describing the strikebreakers as infamous, rendering the activity even more egregious.  Such egregiousness is supported by the fact that the hanging of the poster prompted the cyberbullying of at least one faculty member.  The concern for the strikebreakers identified on the poster was so great that the University directed that it be removed and the Majority determined that the University had legitimate reasons for its removal directive under the totality of the circumstances.

In the instant case, the Majority relies upon the PLRB's *PSSU* case for its definition of unprotected conduct (conduct that is offensive, defamatory, or *opprobrious*) to determine that publishing the strikebreakers list that uses the word *infamous* is protected activity, notwithstanding that the word *infamous* is synonymous with *opprobrious*, the exact word the PLRB uses to describe <u>unprotected</u> conduct. Given the use of the word *infamous*, the six-week delay in hanging the poster, and the

---

[3]  https://www.merriam-webster.com/dictionary/infamous#dictionary/infamous (last visited May 12, 2026).

[4] https://www.merriam-webster.com/thesaurus/infamous (last visited May12, 2026).

resultant cyberbullying, I cannot agree with the Majority's conclusion that publishing the *strikebreakers list* was protected activity under Section 401 of PERA. Accordingly, I respectfully dissent.

For all of the above reasons, I would reverse that portion of the PLRB's final order.

_____
ANNE E. COVEY, Judge

Judge McCullough joins in this concurring and dissenting opinion.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System of     :
Higher Education,     :
           Petitioner     :
    :
          v.     :    No. 209 C.D. 2025
    :
Pennsylvania Labor     :
Relations Board,     :
          Respondent     :    Argued: December 10, 2025


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE MATTHEW S. WOLF, Judge


CONCURRING AND DISSENTING OPINION BY
JUDGE WOLF                            FILED: May 13, 2026


        This matter arises out of events that occurred almost 10 years ago. To summarize paraphrastically, the Pennsylvania Labor Relations Board (PLRB) issued a final order holding that the use of the word "infamous" by the Association of Pennsylvania State College and University Faculties (Union) on an 8.5- x 11-inch "poster" in reference to perceived strikebreakers was protected union activity under Section 401 of the Public Employe Relations Act (PERA).[1] The PLRB further found that California University of Pennsylvania's (University) directive that the Union

---

[1] Act of July 23, 1970, P.L. 563, 43 P.S. § 1101.401.

take down the poster as well as an investigation into a Union official relating to the poster were violations of Section 1201(a)(1) of PERA. 43 P.S. § 1101.1201(a)(1) (unfair practices by public employers). The Majority here finds that use of the word "infamous" on the poster was protected, but that the University's directive to remove the poster and subsequent investigation related thereto did not constitute unfair practices under PERA.

I concur with the Majority's conclusion that the language on the Union's poster, including the word "infamous," falls within the protections of Section 401. There is a long history of the courts recognizing free speech protections for unions, which protections are particularly important when the speech is in furtherance of specific labor activities such as organizing and engaging in disputes with management over working conditions. *See Thornhill v. Alabama*, 310 U.S. 88, 103 (1940) (holding that "[f]ree discussion concerning the conditions in industry and the causes of labor disputes appears . . . indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society"); *Linn v. United Plant Guard Workers*, 383 U.S. 53, 64 (1966) (requiring a showing of actual malice in state libel claims arising from labor disputes in order to "minimize[]" the risk that such suits against unions would "dampen the ardor of labor debate"); *Giant Eagle Mkts. Co. v. United Food & Com. Workers Union*, 652 A.2d 1286, 1292 (Pa. 1995) (observing that nonviolent labor protests are "recognized as a protected form of assembly and free speech by both the United States and Pennsylvania Constitutions"). Pennsylvania appellate courts have long recognized that the often-coarse language used to criticize strikebreaking activities, such as the crossing of picket lines, must be entitled to legal protection. *See Solvent Mach. & Filter Sys., Inc. v. Teamsters Loc. No. 115*, 495 A.2d 579, 580 n.1 (Pa.

Super. 1985) (rejecting the notion that a union picket line that some individuals were afraid of crossing constitutes an illegal seizure, given that the establishment of a picket line and the encouragement of others to follow it are "a lawful exercise of [F]irst [A]mendment rights"); *Arndt v. Unemployment Comp. Bd. of Rev.*, 63 A.3d 849, 855 (Pa. Cmwlth. 2013) (explaining that "picket line rhetoric is not to be construed literally" given that the "language used in labor disputes, like the language used in the political arena, is often vituperative, abusive, and inexact").

Despite the Majority's recognition that the poster's simple name-calling towards alleged strikebreakers during a specific labor activity is protected speech, it goes on to conclude that the University was justified in removing this wholly protected statement, appearing on an 8.5- x 11-inch piece of paper, and subsequently initiating an investigation into the Union because the protected speech "generated fear of physical violence." Majority Op. at 14. This position is flawed both factually and legally and pays no mind to this Court's standard of review.

The University submits that it received emails from two faculty members, Professor Pagen and Professor Hoover, communicating concerns about the "threatening" nature of the poster. Professor Pagen wrote:

> I think, by now, you are all well aware of the actions taken by Barb Hess as APSCUF President. Allow me to voice my concern that this action was taken for the sole purpose [of] ensuring that "The Infamous 45" (which is inaccurate, but I digress) are subjected to further intimidation and attempted public shaming. I would like to think that faculty across campus would not commit acts of violence or physical retribution in some manner, but I can no longer believe that to be so.
>
> It is my hope that the administration will make public their support and protection of those who are named on that list. It is my hope that the administration will make public their condemnation of the actions taken by Dr. Hess, Ken Smelko, and union leadership.

When I crossed the line to meet with administration regarding students, I found myself faced with cyberbullying from both current and former colleagues. At the time, I was fearful when I knew that I would have to be among groups of faculty, I was referred to as a scab (inaccurately, ironically), on-line and on campus.

I don't regret crossing the line. I would do it again if that is what I had to do to ensure our students that all would be well--that they matter to me. I am ashamed, not of my crossing, but of the actions by educators at an institution of higher learning.

I am proud of the work that we theatre-folk ("adjuncts" be damned[;] they are faculty to me). I have always held my position at Cal U close to my heart. I can't speak for my infamous colleagues, but I enjoy working here, with and for you, for our students and the community.

Thank you for reading. Those of us who were named look forward to standing with you against this behavior.

Reproduced Record (R.R.) at 359a (Professor Pagen's Email). Professor Hoover wrote:

I am writing to express my concern related to the recent union posting of strike breakers information.

I feel personally threatened and intimidated by this on a variety of levels. First the sign is directly outside of my office area making me an easy target.

Secondly, I have applied for promotion and the President's Merit Award for Excellence in Teaching both of which require a peer review process.

I view this posting of names as encouragement from the union to retaliate against those of us who did not participate in the strike even though numerous people on the list were off for medical reasons.

I have already contacted [two other individuals] on this matter but following appropriate protocol must also make you aware that I feel this action by the union as a direct threat and it is creating a hostile work environment for me.

*Id.* at 361a (Professor Hoover's Email).

The Majority holds that these emails entitled the University to order removal of the poster and to initiate a subsequent investigation, and that such interference into Union activity was not an unfair labor practice as outlined in Section 1201(a). I could not disagree more that two emails from professors expressing their purely subjective feelings of unease can create a "legitimate basis" for the University's interference with the Union's activity here. The emails state that the Professors "feel" threatened, intimidated, and publicly shamed. The emails do not, however, show that these feelings were anything other than that—just feelings. Importantly, they do not provide a scintilla of evidence that a specific threat of violence had been made against any University staff member.[2] A removal of protected speech in response to two emails from discomfited employees utterly erodes Section 401's protections and is inconsistent with our case law that Section 401's protections may not be easily lost. Put simply, the Majority elevates the personal offenses taken to the Union's rhetoric over the statutory protections guaranteed to the Union under PERA. This is error.

The Majority recognizes that the use of the word "scab" in connection with labor disputes is protected speech. Majority Op. at 9, 11. However, under the Majority's logic, if a strikebreaker referred to as a "scab" claims to "feel personally threatened and intimidated," or claims, without more, a general fear of "acts of violence or physical retribution," then the long-recognized protections afforded that word go out the window. *See* Professor Hoover & Pagen's Emails, *supra* pp. 3-4.

---

[2] From these two emails, the Majority's acceptance that there was a "fear of violence" strains credulity, and the fact that the University dropped the investigation without taking any further action underscores its baselessness.

MSW-5

Equally important, the charge that the poster generated fear of physical violence is flatly contradicted by the PLRB's finding that PASSHE "failed to establish a legitimate reason" for intervening. R.R. at 45a. Indeed, the PLRB adopted the Hearing Examiner's conclusion that the reason proffered by the University for intervening—i.e., that it was "protecting the non-striking faculty from retaliation by [Union] members"—was not credible. *Id.* By ignoring that finding and others by the PLRB, the Majority substitutes its own credibility determinations when resolving the factual question of whether the University acted properly.

I question the Majority's effort to cast the University's decision to remove the poster in a charitable light. For example, the parties freely acknowledged in the proceedings below that the bulletin board where the poster was displayed belonged to the Union. *See, e.g.*, *id.* at 362a (Mr. Guiser's e-mail to faculty referring to "a list that was posted on the APSCUF bulletin board"). Also undisputed is the evidence that the Union paid $515.00 for the bulletin board prior to its installation. *See id.* at 378a. The Majority chooses to refer to the bulletin board as "the bulletin board in the public hallway," suggesting a sort of communal ownership where none ever existed. Majority Op. at 13. Worse, by citing the collective bargaining agreement between the Union and the University that permits Union business to be transacted on University property at reasonable times "provided that such business shall not interfere with or interrupt normal University operations or the responsibilities of faculty members," the Majority stresses that this agreement illustrates "discretion retained by the University over *University property*." *Id.* at 14 (emphasis added). However, the bulletin board was not ever University property; it was privately owned, privately paid for, and privately maintained by the Union for its own purposes next to the Union's office on campus. The bulletin board's location

in the Keystone Building of the University does nothing to change these facts of record, and the University's direction to take down the poster due to fear of physical violence was, as explained above, found not credible. The University's removal of the poster from the privately-owned bulletin board was simply nothing more than interference with legally protected Union activity. Selective citation to the record cannot justify this.

While the Majority correctly recites this Court's standard of review of PLRB orders (limited to determining whether findings of fact are supported by substantial evidence, and whether the PLRB violated constitutional rights, committed a procedural irregularity, or erred as a matter of law), it fails to abide by it. The Majority arrives at its determination by picking and choosing facts. The PLRB's factual findings are supported by substantial evidence; the Majority simply substitutes its own factual findings for those of the PLRB. In doing so, it tramples on the rights of the Union to express itself by sanctioning the coerced removal of the poster from the Union's bulletin board.

The Majority wants to have it both ways. It concludes, rightfully, that the speech at issue was protected by Section 401. But moments later, it concludes that the University's removal of the protected speech (based on flimsy grounds that were wholly rejected by the factfinder below) was not an unfair labor practice under Section 1201(a). Metaphorically speaking, the Majority throws the baby out with the bathwater, and sets a dangerous precedent for future Union activities that have so-called "protections" under Section 401(a). What good are these protections when they can be so easily eviscerated?

Because I would affirm the PLRB in full, I dissent.

_____
MATTHEW S. WOLF, Judge